WERNER, Plaintiff in error, vs. THE STATE, Defendant in error.

*December 12, 1925—January 12, 1926.*

*Abortion: Evidence: Sufficiency: Trial: Dying declarations: Prior declarations tending to contradict: Relevancy: Harmless error: Refusing to strike incompetent evidence: Refusal to permit counsel to discuss evidence erroneously excluded: Witnesses: Privilege against self-incrimination: To whom applicable: Failure of defendant to call as witness one charged with same offense: Review: In criminal cases.*

1. On an appeal from a conviction under sec. 351.22, Stats. 1925, for producing a miscarriage, the evidence is *held* to show that deceased was pregnant during the time she was in defendant's office immediately preceding her death. p. 36.
2. It was error to exclude testimony that deceased had talked to witnesses prior to the offense about her pregnant condition, and that she told them she had used instruments upon herself to induce flowing, in that such testimony tended to contradict the dying declarations of deceased that she was four months pregnant when the offense was committed; but where all the circumstances indicated that deceased was pregnant when the offense was committed the error was not prejudicial. p. 37.
3. It was also error to refuse to strike out the testimony of a witness on cross-examination that she thought deceased was going to defendant's office for treatment for pregnancy; but such error was trifling and not prejudicial where it did not qualify the direct testimony of the witness. p. 38.

4. Where defendant admitted on cross-examination that fifteen or twenty years before he had been convicted for violation of sec. 5480, R. S. of U. S., and which he explained was for fraudulent use of the mails, the court did not err in declining to permit any further explanation.   p. 39. .

5. Nor did the court err in restraining counsel from discussing testimony of witnesses to the effect that deceased had used a crochet hook upon herself to bring about a miscarriage, though some of such evidence was permitted to remain in the record through oversight or indifference, where the court clearly intended to exclude it.   p. 40.

6. Counsel in his argument has no right to discuss evidence not in the record, even though it was erroneously excluded; and if its exclusion was not prejudicial error, the fact that the court did not permit counsel to discuss it is not prejudicial error.   p. 40.

7. A separate trial having been granted to an attendant in the defendant's office, the failure of the defendant to call her as a witness was a proper subject of comment by the district attorney, as the state could have called her as a witness and compelled her to testify under sec. 4078d, Stats., and defendant was entitled to call her to the witness stand in his defense, sec. 4071 being inapplicable.   p. 41.

8. In a criminal case the supreme court cannot review the verdict of the jury in acquitting defendant of the charge of manslaughter, and cannot reverse a verdict of guilty if there be sufficient evidence to support it.   p. 43.

ERROR to review a judgment of the circuit court for Winnebago county: CHESTER A. FOWLER, Judge. *Affirmed.*

The plaintiff in error (hereinafter called the defendant) was convicted of using an instrument with intent to produce a miscarriage on the person of one Alice McCormick. The information charged him with other counts, one for manslaughter in causing the death of Alice McCormick, the other for manslaughter in causing the death of the unborn child. The court dismissed the latter count. The jury acquitted the defendant of the charge of manslaughter in procuring the death of Alice McCormick.

Alice McCormick was a working girl twenty years of age. The defendant is a physician and surgeon practicing in the city of Oshkosh. The relation of physician and pa-

tient existed between the said Alice and the said defendant during the fall and, according to the defendant, also during the spring and summer of 1924. The defendant claims that his treatment of her commenced in April, 1924, at which time he was treating her for gonorrhea; that this infection, however, developed into syphilis, and from June, 1924, to the time of her death, December 31, 1924, he was treating her for syphilis.

It appears without dispute that on Monday, December 9, 1924, in the evening, Alice called at the defendant's office. She had her night dress with her and stayed in his office during that night; she also remained in his office during the next day and the following night. On Wednesday morning, December 31st, when the doctor arrived at his office, he found that a section of the intestine had broken through the wall of her womb and was protruding from the vulva. Alice was very sick and in a most serious condition. The defendant tied up the intestine in an effort to stop bleeding, and called up Dr. Clark at the hospital and requested his immediate consultation. Dr. Clark could not immediately come to the defendant's office. The defendant took a piece of the intestine which he had severed, went to the hospital and interviewed Dr. Clark. Dr. Clark said that an immediate operation would be necessary. The police ambulance was called, Alice was removed to the hospital, where Dr. Clark performed an operation severing and removing the dead ends of the intestine. Alice died that night. The defendant was arrested and an information was filed against him containing the three counts above stated, all based upon the theory that he had performed a criminal abortion upon the deceased. The defendant denies that he performed an abortion upon the deceased, and claims that the presence of Alice in his office during the time in question was in connection with treatments which he was giving her for the disease of syphilis. As the defendant claims not only that the

verdict is not supported by the evidence but alleges certain procedural errors, the prejudicial nature of which must be considered in the light of all the evidence in the case, it is necessary to set forth the evidence in the case at considerable length.

Mrs. McCormick, the mother of Alice, testified that she was at *Dr. Werner's* office four or five times during the fall of 1924. She talked with him about the infection that Alice had. The doctor did not tell her what the infection was. The doctor told her Alice was pregnant. He said he could not do anything while she had this infection.

"Q. He couldn't do anything about what? A. Do anything—I suppose perform this operation; that is the only thing I know, I suppose. Q. What operation are you talking about? A. The illegal operation. Q. Did you talk with *Dr. Werner* about that? A. Well, we did, we talked some about it. I can't remember just what he said, it was so much, it was so long ago. I took $200 up there and gave it to *Dr. Werner* the Friday after Christmas. He told me to tell Alice to come up; he would start in on her at 6 o'clock. That was Friday. In the morning of the Wednesday of Alice's death I went to *Dr. Werner's* office. He called me. When I got the call I went up there. When I got there Alice had been taken to the hospital. When I went in *Dr. Werner* came out of an opposite room and he seemed very excited, and he told me they had taken Alice to the hospital. He was very nervous and great beads of perspiration on him at that time. Q. Now, with reference to this infection and with reference to this operation, was there anything at any time said by *Dr. Werner* with relation to the manner and the necessity of having one done or the other done? A. Yes, sir, he said the infection would have to be cleaned up, and in order to clean that up the child would have to be—she would have to have the child first." The witness continued: "I can't tell when I noticed that Alice was pregnant. She was sick mornings, didn't menstruate, that was about all."

Thurman Stocking, the father of the child, testified that

he talked with *Dr. Werner* about the condition of Alice.
*Dr. Werner* told him Alice was pregnant, and that she also
was diseased, and that her pregnant condition could not be
attended to until her disease was cleared up, and so he went
on taking care of the disease.    He said it would take $125
to rid her of her pregnant condition.    He asked him for
money at different times.    He said the $125 would take
care of her for a week and furnish a nurse and medicine
and the operation.

Margaret Fenrich, a girl nineteen years of age, testified
that she knew Alice McCormick and Thurman Stocking,
and that she and Alice were close friends during the sum-
mer.    On the Friday night before her death Alice told her
that she was going to *Dr. Werner* for a treatment for her
pregnancy.    She was going that night for the first treatment.

The dying declaration of Alice McCormick was intro-
duced, and reads as follows:

"State of Wisconsin, Winnebago County, ss.

"Alice McCormick, being first duly sworn, says: I am
very sick and I have been told by Dr. Clark that I cannot
get well, and I make this statement at the request of the
district attorney knowing full well that I may die.    Monday,
December 29, 1924, I was about four months pregnant with
child.    I went to see *Dr. O. E. Werner* about having him
produce an abortion.    Thurman Stocking is the father of
the child.    I arranged with *Dr. Werner* to pay him $200 to
take the child away.    Stocking was to help pay the doctor.
Monday night I talked with *Dr. Werner* and arranged to
come back Tuesday morning.    I went to his office Tuesday
morning, December 30, 1924, and stayed there all day.    In
the evening the doctor placed me in his work chair.    He
went inside of me with instruments.    I stayed in his office
all night.    A nurse was there all night.    I suffered all night
long.    No one touched me except *Dr. Werner,* and no one
has touched me since except Dr. Burton Clark.    I think
*Dr. Werner* worked on me for about an hour.    I paid him
$200 which I had borrowed.    *Dr. Werner* hurt me badly.
He poked inside of me with instruments.    *Dr. Werner* told

me I was pregnant, and he said he would take the child away for $200.

"(Signed)  ALICE McCORMICK.
"Subscribed and sworn to before me December 31, 1924.
"D. K. ALLEN, Notary Public, Wis."

A post-mortem examination was conducted by three physicians, who testified that the uterus was larger than normal, which might indicate pregnancy, although it might indicate other things as well. The post-mortem examination showed that there had been an opening of the anterior wall of the uterus which had been sutured with catgut. This opening was an inch and a half or two inches long. Dr. Bunting, professor of pathology at the University of Wisconsin, examined the uterus to determine whether it was a pregnant uterus. He found on the front surface an irregular cut approximately an inch in length which had been closed by a catgut suture. On the surface there was also a slight membrane which stripped off very easily; this was a patchy membrane, not over the whole uterus. On opening the uterus the muscular wall was found to be thickened, measuring approximately an inch in thickness. There were no contents except some apparently necrotic material which was of a reddish-brown color. There was no fœtus present. Leading to this ragged wound on the front of the uterus there was a diagonal or oblique path pointing towards the so-called cervical opening to the uterus, leading upward and forward to the line of the wound that had been closed by suture. The cervical opening itself was wider than normal. The muscular walls and the muscle fibers were enlarged. The uterus itself was still pear-shaped, but more cylindrical than the virgin or normal uterus. The decidual cells, also the secreting glands of the uterus, were enlarged in diameter; they were lengthened and had the form that is found in pregnancy. He testified that in his opinion the uterus had been recently pregnant. He also testified that there was an oblique path down towards the vaginal opening connect-

ing with the cavity of the uterus leading to this wound in the front, a path that is not natural there, and that path had been made or cut. It was consistent with the effect of an instrument passing through the wall of the uterus.

The defendant denied that he had made any attempt to abort the deceased. He testified that he had been treating her for several months for gonorrhea and syphilis, denied that he had any conversation with the mother or Stocking, the father of the child, concerning an operation for its removal. He admitted that the mother had paid him $200, but that was for his services in connection with his treatment of the venereal diseases. He admits that the mother told him she was trying to get the money from Stocking, but that Stocking did not come around to see Alice any more and wasn't going to pay. He claimed that Alice had urethritis, which was hard to treat while she was on her feet. He told Alice that if she would lay off for a little while he would give her a little attention, get her a nurse, and, with proper attention and rest, she ought to get over the urethritis, or the worst part of it, in about five days. He admits that Alice thought she was pregnant, although he testified that she flowed every month. He testified that Alice came into see him on Monday evening on her way to a friend's house. She complained of pain and he gave her a hot-water bath. It was in the neighborhood of 9 o'clock on Monday evening, and she said she would rest a few minutes and go. The next morning she told him she stayed there all night. He saw her at half-past 10 on Tuesday. Tuesday evening he put her on the operating table and examined her with a speculum—the common way of making a vaginal inspection. He removed some blood clots, packed the vagina with gauze, and carried her back on the cot. He gave her two hypodermics, one of ergotine and the other of fibrogine, to control any possible hemorrhage. There was nothing done that night with reference to using any instrument for the purpose of producing an abortion,

or for any purpose. She stayed at his office that night, and Miss Herter, his attendant, remained with her. When he saw her at the office Wednesday morning she was in the condition heretofore stated. He testified that when he packed the vagina Tuesday evening Celia Herter, his attendant, and three other women, Mrs. Sebora, Mrs. Horne, and Mrs. Lampert, were present. These three women were patients of the doctor and had but such slight acquaintance with Alice as was formed by their casual meetings in the doctor's office during the fall and summer.

Mrs. Lampert and Mrs. Sebora testified that they witnessed the treatment which the doctor gave Alice on Tuesday evening, their description of the same conforming to that of the doctor. They also testified that they were present the next morning when the doctor first saw Alice; that he called them into the room and they saw her condition; that the doctor placed her on the operating table, tied up the intestine, called for Dr. Clark, and took her to the hospital. They also testified that when the doctor had gone they asked Alice what had happened; that she told them that she thought she was not flowing enough; that she got up, went to the doctor's table, took some instruments she had found there and inserted them into her private parts.

Such is a general outline of the evidence. More specific consideration thereof will be given in the opinion. To review the judgment the defendant brings the case here on writ of error.

For the plaintiff in error there was a brief by *Williams & Williams* of Oshkosh and *Winfred C. Zabel* of Milwaukee, and oral argument by *George E. Williams*.

For the defendant in error there was a brief by *D. K. Allen*, district attorney of Winnebago county, *R. Curtis Laws*, assistant district attorney, the *Attorney General*, and *J. E. Messerschmidt*, assistant attorney general, and oral argument by *Mr. Allen*.

OWEN, J.   It is first contended by the defendant that the evidence does not support the verdict.   The verdict convicted the defendant of an offense under sec. 351.22, Stats., which reads:

"Any person who shall administer to any pregnant woman, or prescribe for such woman, or advise or procure any such woman to take any medicine, drug or substance or thing whatever, or shall use or employ any instrument or other means whatever, or advise or procure the same to be used, with intent thereby to procure the miscarriage of any such woman shall be punished by imprisonment in the county jail not more than one year nor less than six months or by fine not exceeding five hundred dollars nor less than two hundred and fifty dollars, or by both such fine and imprisonment in the discretion of the court."

It is contended that the evidence failed to show that the deceased was pregnant on the evening of December 30, 1924.   It is true that physicians who testified in behalf of the State were unable to say from the examination of the uterus made after death that it was a pregnant uterus on the evening of December 30th, or at any time recently prior to her death.   They testified quite generally that the uterus was enlarged; that that was one indication of pregnancy, but that it was a condition that might result from other causes.   Dr. Bunting testified to many facts concerning the uterus, and expressed the opinion, without any reservation, that it "was a pregnant uterus, from which the major part of the fœtus—practically the entire part of the process of conception—had been removed."   It may be readily conceded that if it were necessary to establish this fact by the testimony of the physicians alone, the finding of pregnancy would rest very much in doubt.   However, there are many other circumstances disclosed by the record which do establish very satisfactorily the fact that the deceased was pregnant during the time she was in the doctor's office immediately preceding her death.

There is the testimony of the mother to the effect that she was at the doctor's office a number of times during the fall of 1924, and that she first called at his office upon his request. During that time the condition of the deceased was the subject of discussion between them. He told her about the infection. He also told her that the deceased was pregnant, and that he couldn't do anything about her pregnancy while she had this infection, and they talked about an illegal operation. On Friday, the day after Christmas, she gave *Dr. Werner* $200. Upon paying the money the doctor told the mother to have Alice come up at 6 o'clock Friday evening and he would start on her. Alice did go up to the doctor's office Friday evening, and before going up she told Margaret Fenrich that she was going to the doctor's office for the first treatment for her pregnancy. Monday night she again went to the doctor's office, taking with her her night clothes, in evident preparation to remain there during the night. The doctor's offices consisted of six or seven rooms, two of which had beds or cots. She remained at the office Monday night, she remained there all day Tuesday, and Tuesday night. The doctor himself admits that he talked with Alice about her pregnancy. He admits that Alice thought she was pregnant, although the doctor testified that he had assured her that she was not. The testimony of Stocking, the young man responsible for her condition, was to the effect that he had conferred with the defendant concerning the condition of the deceased, and that he and the deceased had gone to the defendant's office together upon one occasion. He testifies that while they talked about the diseased condition of both of them, they also talked about the pregnancy of the deceased, and that the defendant told him that it would require $125 to remove the pregnancy. He told him that this would pay for the operation and professional care and attention and nursing for one week. From all this evidence the conclusion is

irresistible that the deceased believed that she was pregnant and that her condition in this respect was the subject of conversation between her and the defendant. The other circumstances of the case must be construed in the light of this conceded belief on the part of the deceased. Immediately upon the payment of $200 the deceased calls at the defendant's office for a treatment. She tells her girl chum that she is going there to receive her first treatment for pregnancy. The following Monday evening she repairs to his offices, prepared to remain during the night, the following day and the following night, and what is more significant than all these other facts and circumstances is that her uterus was actually invaded while she was in the doctor's office, evidently for the purpose of removing a state of pregnancy.

We have, therefore, a woman who, concededly, believes herself pregnant, repairing to a doctor's office concededly for the purpose of treatments by that doctor, and we have the further conceded fact that, while in his office, there was an actual invasion of the womb. In the light of all these facts the conclusion is permissible if not irresistible that the deceased was in a pregnant condition when she went to the doctor's office on Monday evening. In addition to that we have the testimony of the mother, the testimony of the girl chum, the testimony of the young man who was responsible for her condition, and the dying declaration of the deceased received in evidence without objection or limitation. In view of all these facts, the contention that the finding of pregnancy of the deceased is not supported by evidence is quite guileless.

The defendant attempted to show by the testimony of Mrs. Lampert and Mrs. Sebora, the two women who testified they were present in the doctor's office both on Tuesday night and Wednesday morning (a rather singular coincidence), that the deceased had talked to them on prior occasions about her pregnant condition, and that she told them

she had used instruments upon herself to induce flowing. This testimony was offered on the theory that the defense had the right to introduce prior statements made by the deceased which contradicted or tended to contradict her dying declaration. Such testimony was undoubtedly proper. 2 Wigmore, Evidence, § 1033. This rule the court no doubt had in mind, and upon numerous occasions he told attorneys for the defendant that "anything that tends to impeach or contradict statements of herself contained in this so-called dying declaration, I will permit you to go into, but I don't think that this does." Attorneys for the defendant argue that such testimony does tend to dispute her dying declaration that "Monday, December 29, 1924, I was about four months pregnant with child." The contention is that statements made to these women to the effect that she had used instruments upon herself to induce flowing tended to contradict the statement that she was four months pregnant on December 29th. Whether this testimony was admissible calls for rather close scrutiny of the situation. Her dying declaration was that she was four months pregnant. Manifestly, if she had had a miscarriage within four months, she was not four months pregnant on December 29th. If she had induced flowing, and flowing was inconsistent with pregnancy, it would indicate that she was not pregnant prior to her latest menstruation. The medical testimony, however, is that while menstruations do not generally obtain during pregnancy, they may do so. The fact that they are not usual during pregnancy perhaps raises a presumption that there is no pregnancy at times when menstruations occur. We are quite convinced that it would have been entirely proper to have received this evidence, and that its exclusion was error. But whether it was prejudicial error depends upon whether a different result might probably have obtained had it been admitted. We think the probative value of such evidence would have been very slight, and that, in view of all the circumstances which indi-

cate her pregnant condition on Monday evening, its exclusion cannot be considered prejudicial.

It is further argued that the court committed error in refusing to strike out certain testimony of the witness Margaret Fenrich. It will be remembered that Margaret Fenrich was the girl chum of the deceased who testified the deceased told her she was going to the doctor's office Friday night to receive her first treatment for her pregnancy. In her direct examination this testimony is positive and unequivocal, and was admitted upon the authority of *State v. Dickinson,* 41 Wis. 299. Upon cross-examination she was asked concerning her knowledge, generally, of the visits made to the doctor's office during the spring and summer. She was questioned thus:

"*Q.* You knew that she went there frequently? *A.* Yes, sir. *Q.* Almost every night? *A.* Yes, sir. *Q.* And every noon? *A.* Yes, sir. *Q.* Beginning last spring? *A.* Yes, sir. *Q.* Did you know what her treatments were for? *A.* Yes, sir. *Q.* A venereal disease? *A.* Yes, sir, and pregnancy. *Q.* She told you the pregnancy was back in the spring, is that right? *A.* The first few times she went it was for a disease, then the pregnancy was discovered, and I don't know just what she was going for after that, but I thought it was for the same thing."

The defendant's attorney moved to strike out the latter part of the last answer, "but I thought it was for the same thing." The court refused to strike it out. Of course it should have been stricken out, but the refusal to do so cannot work a reversal. It was a trifling matter and could have had no effect upon the verdict. It in no manner qualified her direct testimony where she testified the deceased told her she was going to the doctor's office Friday night for her first treatment for pregnancy.

Upon cross-examination defendant admitted that fifteen or twenty years ago he had been convicted of a violation of sec. 5480 of the federal statutes. He was permitted to

explain that the offense for which he was convicted was a fraudulent use of the mails, and the court declined to permit any further explanation. This is assigned as error, to establish which reliance is placed on *Remington v. Judd*, 186 Wis. 338, 202 N. W. 679. It is there said that where it appears that a witness has been convicted of crime, and this appears in evidence, he should be permitted to explain in a general way the nature of the offense for which such conviction was had, the reason being that the fact of his conviction is brought up for the purpose of affecting his credibility, and "offenses vary within vast ranges as to their impeaching power." We think that when it was shown that his conviction was for fraudulent use of the mails, it was within the discretion of the court as to whether the examination along this line should proceed any further. Manifestly the details of prior conviction cannot be inquired into. As some offenses reflect more seriously upon the credibility of a witness than others, it is perfectly proper to show the nature of the offense of which the witness was convicted, but the extent to which extenuating circumstances may be shown should be left to the discretion of the trial court.

Error is further predicated upon the fact that the court erred in not permitting counsel to make an argument to the jury based upon the testimony of Mrs. Sebora and Mrs. Lampert, to the effect that the deceased used a crochet hook a number of times upon herself to bring about a miscarriage, or to induce flowing. Counsel point out that some testimony of this kind crept into the record notwithstanding the fact that the court all along insisted that such testimony was inadmissible. During arguments of counsel, and while he was dwelling upon this testimony, the court said: "I do not recall that there was anything received in evidence to the effect that this girl prior to this time had attempted to produce a miscarriage upon herself. I do not recall that

anything of that kind is in evidence." Counsel asked: "Do I understand you to hold that that was improperly admitted?" The court replied: "Yes, I do." Counsel then asked: "How about the question of her having been pregnant twice and eliminating it—and she got rid of it?" To which the court replied: "I don't think that has anything to do with the case at all." It was clearly the intention of the court to exclude evidence of statements made by the deceased concerning the use of crochet hooks upon herself. We have indicated that such evidence should have been received for the purpose of disproving her dying declaration, but that the refusal to receive such evidence does not constitute reversible error. It follows as a consequence that even though some of that class of evidence was permitted to remain in the record through oversight or indifference, it was proper for the court upon the argument to say that such evidence was stricken, and if it was not prejudicial error to exclude such evidence it was not prejudicial error to restrain counsel from discussing it. The counsel had no right to discuss evidence not in the case, even though it was erroneously excluded. If it was not prejudicially excluded, prejudicial error cannot be assigned upon the fact that the court did not permit counsel to discuss it.

Another assignment of error is based upon the following circumstance: The information was filed originally against *O. E. Werner* and Cecilia Herter, a woman who was the doctor's attendant. Upon motion of the defendant, separate trials were granted. Cecilia Herter was not called as a witness by either party. In his argument to the jury the assistant district attorney commented upon the fact that the defendant had not called Miss Herter to testify in his behalf. Objection to this line of argument was overruled by the court. Sec. 4071, Stats., provides that "In all criminal actions and proceedings the party charged shall, at his own request, but not otherwise, be a competent witness; but his

refusal or omission to testify shall create no presumption against him or any other party thereto." It is argued that Cecilia Herter was a party to this prosecution, though not a party to the trial, and that she was a competent witness only upon her own request; that the defendant was powerless to compel her testimony, and that his failure to do so should not be commented upon in argument to the jury. It has been held that reference by the district attorney to the fact that the defendant has not taken the witness stand in his own behalf is gross impropriety. *Martin v. State,* 79 Wis. 165, 48 N. W. 119; *Dunn v. State,* 118 Wis. 82, 94 N. W. 646. It would seem plain that if Cecilia Herter and the defendant had been tried together, and Miss Herter had not seen fit to take the stand in her own behalf, that that fact should create no presumption against her or the doctor. However, Miss Herter was not here on trial. She could not be a witness in her own behalf. She was under no necessity then and there of defending herself. The State could have called her as a witness and compelled her to testify under sec. 4078*d,* although after such testimony she could not have been prosecuted on account of any transaction, matter, or thing concerning which she testified. Whether defendant could compel her testimony under the provisions of this statute is an open question in this court. *State v. Grosnickle, ante,* p. 17, 206 N. W. 895. However, we see no reason why the defendant in this case could not have subpœnaed her and placed her upon the witness stand. If she saw fit to waive her constitutional privilege, immunity would not attach. *State v. Grosnickle, supra.* If she could have testified to facts establishing the defendant's innocence, we see no reason why he should not have gone to the extent at least of placing her on the stand. It is hardly to be presumed that facts establishing the doctor's innocence would establish her guilt. But whether that be so or not, the defendant in this trial certainly had the right

of going so far as calling her to the witness stand.   If he
did not do so, we fail to see why it is not just as much a
proper subject of comment as the failure to call any other
witness who had knowledge of the transaction.    This is
true unless the provisions of sec. 4071 make such comment
improper.   *Comm. v. Richmond,* 207 Mass. 240, 93 N. E.
816.   We do not find that this court has heretofore con-
sidered sec. 4071 in this connection.   But a careful consider-
ation of its provisions impels us to the conclusion that it
does not apply to the circumstances here under consider-
ation. *It makes one accused of crime a competent witness
in his own behalf.   However, in making him a compe-
tent witness it places him under no obligation to testify.
Whether he shall testify or not is a matter left to his own
discretion, and if he does not testify it shall create no pre-
sumption against him, neither shall it create any presump-
tion against any other party who may be on trial with him.
While the language of the statute speaks of parties to crim-
inal actions and proceedings, the manifest purpose of the
statute is to save parties thereto from any presumption
against them by reason of the fact that another party to the
proceeding has not taken the stand to testify in such party's
own behalf.   As a party has no opportunity to testify in
his or her own behalf except when he or she is on trial,
the term "actions and proceedings" as used in this statute
means trials.   Cecilia Herter was not a party to the trial.
We think, therefore, that the failure of the doctor to call
Cecilia Herter as a witness was a proper subject of comment
on the part of the district attorney.

This disposes of all detailed assignments of error.   We
have slighted none of them.   Each and every one has re-
ceived our serious consideration.   We recognize this as an
important case and one fraught with serious consequences
to the defendant, but we believe that justice has been done.

We think that the evidence leaves little doubt of the fact that the deceased was pregnant when she went to the doctor's office Monday night. There is no doubt that a criminal operation was performed upon her between that time and Wednesday morning. The only question is whether it was performed by the defendant or by herself. It seems highly improbable that a girl twenty years of age, believing herself to be pregnant, under the constant care and observation of a physician, should repair to his office, prepare to stay there at least over night, and while there undertake such an operation by her own hand. It was an operation attended with great pain—physicians on the part of the State testifying that the operation induced such pain as to make it highly improbable that it could be self-inflicted. The verdict of the jury is difficult to understand. The jury finds the defendant guilty of an intent to produce a miscarriage, and at the same time acquits him of manslaughter. These conclusions seem irreconcilable. If he committed the abortion he was certainly responsible for the death of the deceased. If it were a verdict in a civil case we would probably say that it was inconsistent and would not permit it to stand. But this is a criminal case. Our power over the verdict is somewhat different. We cannot review the verdict of the jury in acquitting the defendant of the charge of manslaughter. We cannot reverse the verdict of guilty if there be the proper quantum of evidence to support it. It is not at all improbable that the jury felt that the defendant would be sufficiently punished by his conviction of the lesser offense. However, we need not speculate upon the process of reasoning by which the jury arrived at their verdict. If it be wrong, it is wrong in so far only as it acquitted the defendant of manslaughter. While the court erred in excluding some evidence, it was evidence of very slight probative value, and we cannot believe that its exclu-

sion amounted to prejudicial error. Upon a very thorough consideration of the entire case we come to the conclusion with considerable assurance that the judgment should be affirmed.

*By the Court.*—Judgment affirmed.

ESCHWEILER, J., dissents.