KRAUT, Plaintiff in error, vs. THE STATE, Defendant in error.

*May 19—June 21, 1938.*

388

For the plaintiff in error there was a brief by *Geo. B. Clementson* of Lancaster and *Graves & Earll* of Prairie du Chien, and oral argument by *Mr. J. S. Earll* and *Mr. Clementson.*

For the defendant in error there was a brief by the *Attorney General, J. E. Messerschmidt,* assistant attorney general, and *Richard W. Orton,* district attorney of Grant county, and oral argument by *Mr. Orton* and *Mr. Messerschmidt.*

MARTIN, J.  Dorothy Holzinger, eighteen years old, started keeping company with one Monroe Sietz, a young farm hand, about June 13, 1936.  In the fall, in October or November, Monroe and Dorothy had sexual intercourse at various times.  These acts of intercourse continued through the following two months, and resulted in Dorothy becoming pregnant in the month of December or January.  Her pregnancy is undisputed and is admitted by the testimony of the defendant.  Dorothy told Monroe that she was pregnant the latter part of January, 1937.  She and Monroe talked about having an abortion performed, about going to see the defendant for that purpose, and about raising the money for the operation.

Monroe went to the defendant's office in the city of Lancaster on the evening of February 22, 1937. At that time he was not acquainted with the defendant, and upon his arrival at defendant's office, defendant was engaged at a meeting, there being eight or ten men in his office. Defendant took Monroe into his inner office and asked him what his trouble was. Monroe told him that he was in trouble with a girl and wanted to know what he could do to get her out of trouble. Defendant asked for the girl's name and about her folks, where they lived and what the girl was doing. He then asked how far along she was in pregnancy. Monroe replied about six weeks. There is a conflict in the testimony as to what was said on this occasion. Monroe testified that defendant said: "There is only one thing we can do, he said, and that will cost you $35." Monroe further testified that he asked defendant if that had to be in cash before the operation, and defendant said: "Yes." Monroe testified that he asked defendant if it would be all right to wait another week, that he would try and raise the money, to which defendant replied he guessed it would be. Defendant admits that Monroe called at his office on the evening of February 22d; that he took him into the inner office; that Monroe said to him that he had a girl that he had been going with by the name of Dorothy Holzinger in trouble; feared he had her pregnant; that Monroe then wanted to know if he couldn't do something about it for him. "I said I didn't care to handle those kind of cases and did not and that I was busy in attending a meeting in the outer office. . . . I did not care to discuss the matter with him any further. He left, and I told him that perhaps he could come up on some future date if he wished and we would discuss the matter more thoroughly; and then he left."

It is admitted that Monroe called at defendant's office on the evening of March 1st. Monroe testified that on this occasion his brother Kenneth and Dorothy accompanied him in

his car to the defendant's office, but that they remained in the car while he was in the defendant's office; that defendant on this occasion did not recognize Monroe, and again asked him his name and what he wanted. Monroe then said that he had been there the week before, referred to the conversation had, and told defendant he had not been able to raise the money, and asked defendant whether it would be all right to wait another week. Defendant again inquired how far along the girl was in her pregnancy, and defendant said: "He guessed it would be all right." It appears that Monroe next saw Dorothy on the evening of March 4th or 5th, and had a conversation with her about raising the money to pay defendant. They finally decided that Dorothy should see her sister the following Saturday and ask her sister for the money. It appears that Dorothy did not see her sister on Saturday, but on Sunday evening, March 7th, Dorothy told Monroe that she had got $30 from her sister, and that he would have to get the other $5.

Concerning Monroe's call on the evening of March 1st, defendant testified:

"On the evening of March 1, 1937, he again came to my office and said that he came up on the same mission that he had before, with the exception that he had been giving Dorothy Holzinger—they had obtained some drugs and was giving them to her, had given them to her to take, and he feared he was getting her—she was getting in bad shape; and wanted to know if I wouldn't treat her or examine her if he brought her up. I said I did not care to have anything to do with those particular kind of cases and he said, 'Well, we will have to have somebody take care of her.' 'Well,' I said, 'You are at liberty to go wherever you wish.' 'Well,' he said, 'How much would it cost to have it?' 'Well,' I said 'Who is paying the bill on this?' And he said he was. I said, 'Have you any money?' He said he didn't. I said, 'In view of the fact that this is in the nature of a confinement case and the usual fee is $35, I will expect that amount for taking care of this girl.' "

On Monday evening, March 8th, Monroe took Dorothy to the defendant's office. Dorothy gave Monroe the $30 she had borrowed from her sister. Monroe testified that he first went up alone to the defendant's office and asked defendant if it would be all right to bring the girl up; that defendant then asked Monroe if he had raised the money, also inquired as to what the girl was doing, and as to where she was then living; that defendant then wanted to know how she would get by without her folks finding out. Monroe said she wasn't staying at home 'now; that she was living with her grandmother and was working at the courthouse. Defendant inquired as to the nature of the work, and as to whether she was standing up very much. Monroe told defendant that Dorothy had to sit down most of the time doing her work. Defendant then told Monroe to bring Dorothy up to his office. Monroe was asked:

"*Q.* What happened then? *A.* Well, he was in his inner office again. He came out in a short time and spoke to Dorothy, and she spoke to him. Then she went on to the inner office, and then I gave him the $35. He said, 'Well, you won't want to stay up here, will you?' I said, 'No, I guess not.' Then I asked him how long it would take him. He said maybe half or three-quarters of an hour, because he had to sterilize some instruments first. I said, 'All right, tell Dorothy that I will be down to the car waiting for her.' So I went down to the car."

Defendant testified that Dorothy called at his office late in the afternoon on March 8th, and told him that she was the girl that Monroe Sietz had told him about previously, and said she feared she was getting in such shape that she would have to have some assistance; that she was flowing intermittently and had some intermittent pains.

"I said, 'The usual arrangements have not been made here, Dorothy, and you better get hold of your boy friend as soon as you can and both of you come up here and see me.'"

As to the call on the evening of March 8th, defendant testified:

"Monroe Sietz came to my office and said that he had Dorothy down in the car and would bring her up to see me. He brought her up to the outer office. I spoke to them, called them by name, and took them into the inner office. He then paid me the usual fee that I requested. I said, 'Now, it will take a little time for me to make this examination, as I must sterilize some instruments purposely to make the examination.' I then put a bivalve speculum and a pair of dressing forceps in the sterilizer and boiled them. In the meantime I inquired from her as to how she was feeling, and she said she wasn't feeling very good, was having some pain, quite a lot of pain, flowing some. She said she lived with her folks in South Lancaster. I took her temperature, which was normal, and her pulse was normal. I then placed her on the examining table, felt over the lower abdomen, and found the uterus was contracting,—contracted down, rather tensely; and there wasn't any degree of tenderness, some pain on pressure. I then placed her in position where I could make a vaginal examination, and got the previously sterilized speculum and dressing forceps. On first inspection I found she was wearing a cloth or commonly perineal pad or Kotex which seemed to be and was fairly well soaked with blood. There was some blood of course exuding or flowing from the vagina. I then introduced the speculum to throw the cervix or the mouth of the womb in place, in view, rather. I found the vagina full of blood. I took a piece of cotton or a sponge on the dressing forceps and swabbed out the vagina to better throw the mouth of the womb into view. The mouth of the womb or the os was dilated. The cervix was very pliable and soft, and there was blood exuding from the os. During the examination she complained of intermittent pains in her lower abdomen. I could then see there was seemingly sort of contractions or bearing down on the part of the muscles of the uterus. I then placed a common tampon in the lower vaginal tract, somewhat firmly but gently, against the mouth of the womb; left it in place; removed the speculum, and told her that I thought she was on the verge of a miscarriage, and that she should go home, go

to bed and rest; and by all means tell her mother about it, and that if she did at any future time miscarry or needed any further medical assistance she was at liberty to call upon me at any time for such assistance."

Defendant further testified that Dorothy again called at his office on the afternoon of March 13th, at which time Dorothy told him she had miscarried; that she had passed a foetus and the placenta, which she took to be the afterbirth, the foetus and placenta intact in a sac, and that she could see the small child or baby floating around; that she passed it in bed on the evening or night of March 10th; that on this occasion Dorothy's pulse and temperature were normal. This was the last time defendant saw Dorothy.

It appears that Dorothy entered the Fowler-Houghton Hospital in Lancaster on the afternoon of March 17th, at which time she had a temperature of 105.4. While there she was attended by Drs. Fowler and Houghton. At the trial, Dr. Fowler testified as to Dorothy's temperature upon entering the hospital; that Dorothy complained that she was suffering from great pain in her lower abdomen; that she thought she had appendicitis; that she had been pregnant, and that she had had an operation performed on March 8th for the purpose of producing a miscarriage. Dr. Houghton testified that Dorothy told him after entering the hospital on March 17th, while describing her physical condition, that she had been recently pregnant, and had "had an abortion performed." Dorothy died on March 24, 1937. An autopsy on the body of Dorothy was held on March 25th. It was performed by Dr. J. H. Fowler, assisted by Drs. H. W. Carey and J. D. Glynn, and was attended by Drs. Rush, Godfrey, and Elgie M. Houghton. At the trial, Dr. Fowler testified that the cause of Dorothy's death was septicemia which was due to a general peritonitis which was an extension of a pelvic cellulitis which in turn was due to the extension of an endometritis, "and this endometritis was

undoubtedly, as far as I am concerned, the result of an abortion." Dr. Houghton testified that her death was due to general peritonitis subsequent to endometritis which was caused by an abortion. Dr. Carey testified that peritonitis was the direct cause of death which was caused by endometritis which was caused by retained placental tissue. Dr. Godfrey testified that peritonitis caused Dorothy's death; that the peritonitis was caused by an infected uterus and that the infection in the womb was probably caused by miscarriage. Dr. Gordon Ritchie, a member of the department of pathology of the University of Wisconsin, examined the tissues mailed by Dr. Fowler to the state laboratory of hygiene and testified that in his opinion Dorothy had been recently pregnant; that her death was caused by abortion with endometritis and a secondary or following peritonitis; that the appendix had no bearing on her death. Dr. S. B. Pessin testified that the direct cause of Dorothy's death was peritonitis which was due to an extension of an inflammation which had been present inside the womb, which inflammation was the result of incomplete abortion. He further stated there was no other cause apparent for the peritonitis.

It appears that on February 6th Monroe Sietz purchased some five-grain quinine pills which he gave to Dorothy that day, and that she took three or four of these pills on February, the 6th.

The defendant assigns as error:

(1) The court erred in admitting improper evidence against the objections of the defendant.

(2) The court erred in rejecting evidence offered by the defendant and in making prejudicial remarks in the presence of the jury in ruling upon such evidence.

(3) The court erred in instructions to the jury when the case was submitted to the jury and in instructions and remarks made by the court when the jury returned for further instructions.

(4) The court erred in permitting the district attorney to abuse the privilege of a prosecutor in persistently repeating questions to the witnesses after the court had sustained objections to similar questions; in permitting the district attorney to ask suggestive questions; in permitting the district attorney to make improper and prejudicial remarks to and in the presence of the jury and in ruling upon objections to such remarks.

(5) The court erred in refusing to grant a new trial for the reasons stated in the several assignments of error and because the defendant did not have a fair trial.

The first assignment of error goes to the admissibility of the testimony of Agnes Holzinger, Monroe Sietz, and Kenneth Sietz as to declarations of the deceased concerning her intention to go to the defendant for the purpose of securing the performance of an abortive operation, and as to the testimony of Drs. Fowler and Houghton as to declarations of the deceased. The statements testified to were not made in the presence of the defendant. Seasonable objections were made to the admission of such testimony. Agnes Holzinger was permitted to testify as to the conversation she had with her sister, Dorothy, on Sunday, March 7th, on which occasion Dorothy got from her $30. The testimony, in this connection, is as follows:

"*Q.* What was the conversation you had with Dorothy at that time concerning her condition? *A.* Well, we were talking about money affairs and she told me she needed some.

"Mr. Earll: If the court please, it is understood that this is all under objection.

"The court: It may be so understood.

"The witness: That she needed some money, that she was pregnant and needed money, and I told her that I wouldn't give her the money.

"*Q.* Did she say what she wanted the money for? *A.* Yes.

"*Q.* What did she say she wanted it for? *A.* To pay Dr. Kraut for performing an operation to produce an abortion.

"Mr. Earll: If the court please, we take exception to that and ask that it be stricken out and the jury instructed to disregard the testimony.

"The court: Motion denied now. If you can show me afterwards that I am wrong on this ruling, I will instruct the jury then to disregard it. It is denied now. Proceed and tell us the rest of your conversation.

"Q. Did she say at that time when she intended to go to Dr. Kraut? A. She did.

"Q. When did she say she intended to go? A. On Monday night, that would be the next night, the 8th of March.

"Q. Did she say that the arrangement had been made with Dr. Kraut to perform the operation?

"Mr. Earll: Objected to as leading.

"The court: Objection sustained. Don't ask leading questions.

"Q. Did you give her the money? A. I didn't give it to her. I told her it was in my purse on the dresser, and she got it.

"Q. Do you know how much money she took from your purse? A. It was thirty dollars."

Monroe Sietz testified with reference to conversations he had with Dorothy subsequent to the time she told him she was pregnant, about going to the defendant for the purpose of having an abortion performed, and their talk about raising the money for the operation; that it was decided that he was to go see defendant; that he did so on February 22d. He further testified as to the conversation he had with Dorothy after he had called on the defendant on the evening of February 22d, and that on this occasion he and Dorothy discussed the matter of raising the $35, and it was agreed that she should try and get it from her sister. He also testified as to the conversation he had with Dorothy on the evening of March 7th, at which time Dorothy informed him that she had succeeded in raising $30, but that he would have to get the other $5. Monroe also testified as to the receipt of two letters written to him by Dorothy, one under date of Febru-

ary 18th, and the other under date of March 2d. These letters were received in evidence. The only material part of the letter of February 18th is as follows:

"I know you won't think much of this but we had better do it anyway. If Marian doesn't hear pretty soon and if she does hear and it doesn't do any good I will take a chance on an operation. That is if you will let me. I will get a job and help foot the bill. I think it would be the best plan to get rid of it some way."

The only material part of the letter of March 2d is as follows:

"Don't you think you can get along without drawing til the end of next week? . . . . I will be willing to stay home if we can just save some money. Because you know, we have to. Since I have a job I hope it lasts long enough so that I can help pay our big bill that is on the way."

Kenneth Sietz, who accompanied his brother, Monroe Sietz, and Dorothy, on the evening of March 1st, was permitted to testify as to a conversation with Dorothy on that occasion. He was asked:

"*Q.* Did you have any conversation with Dorothy Holzinger that night concerning her intention to go to Dr. Kraut's office and have an abortion performed? *A.* Yes, sir."

Defendant's counsel objected to that as calling for hearsay. The answer was permitted to stand. He was then asked:

"*Q.* What conversation did you have with her?
"Mr. Earll: Same objection.
"The court: The same ruling. He may answer.
"*A.* They were going to see Dr. Kraut about this operation, and they said they could wait another week if they didn't have the money."

It should be noted that the testimony of Agnes Holzinger relates to declarations made by the deceased the afternoon before the alleged operation by the defendant, the substance of her testimony being to the effect that Dorothy said she

was pregnant, and that she needed money to pay defendant for performing an operation to produce an abortion, and that she intended going to defendant's office for that purpose the following evening. Kenneth Sietz's testimony relates to declarations made by the deceased one week before the alleged operation by defendant and one week after his brother, Monroe, had first visited the defendant. Dorothy's declarations were to the effect that she was pregnant and intended to see defendant concerning an abortive operation. Monroe's testimony not only related to the conversations he had with the deceased relative to her unfortunate condition, but he also participated in negotiations with defendant as disclosed by his testimony and that of the defendant. This testimony was admissible as a part of the *res gestæ* under the decisions of this court in *State v. Dickinson,* 41 Wis. 299, and *Werner v. State,* 189 Wis. 26, 206 N. W. 898, and cases cited. To the same effect see *State v. Hunter,* 131 Minn. 252, 154 N. W. 1083; *State v. Howard,* 32 Vt. 380; *State v. Patterson,* 105 Kan. 9, 181 Pac. 609; *Weightnovel v. State,* 46 Fla. 1, 35 So. 856; *People v. Fritch,* 170 Mich. 258, 136 N. W. 493; *Commonwealth v. Trefethen,* 157 Mass. 180, 31 N. E. 961; *People v. Atwood,* 188 Mich. 36, 154 N. W. 112; *State v. Ryder,* 80 Vt. 422, 68 Atl. 652; *State v. Power,* 24 Wash. 34, 63 Pac. 1112; *Solander v. People,* 2 Colo. 48; *Johnson v. People,* 33 Colo. 224, 80 Pac. 133.

On the same authority, we are of the opinion that the two letters written by Dorothy to Monroe are admissible. No distinction can be made between oral and written declarations.

There can be no doubt as to the existence of an unlawful conspiracy between Dorothy and Monroe to bring about an abortion. As to them, the conspiracy had its inception on or about February 6th. There is evidence to warrant the conclusion that the defendant joined the conspiracy on Feb-

ruary 22d, and that he continued in the conspiracy until and including the operation at his office on the evening of March 8th. It is conceded that Dorothy was pregnant, and that she had a miscarriage on the night of March 10th. The rule is well established in this state that where several parties conspire or combine together to commit an unlawful act each is criminally responsible for the acts his associates commit in the prosecution of the common design, the act of each one of the conspirators in contemplation of the law, being the act of each and all. *Miller v. State,* 25 Wis. 384; *Pollack v. State,* 215 Wis. 200, 253 N. W. 560, 254 N. W. 471. To the same effect see *Johnson v. People,* 33 Colo. 224, 80 Pac. 133; *State v. Gilmore,* 151 Iowa, 618, 132 N. W. 53; 3 Greenl. Ev. 94; *State v. Crofford,* 133 Iowa, 478, 110 N. W. 921, 924, 925. We are of the opinion that the testimony as to the declarations of the deceased was admissible on the ground that they were statements made in furtherance of a criminal conspiracy and were evidence against others engaged with the deceased in the criminal conspiracy.

As to the admissibility of the testimony of Drs. Fowler and Houghton as to statements made to them by Dorothy when she entered their hospital, March 17th,—they were both permitted to testify over objection that they had a conversation with Dorothy; that she said she had great pain in the lower part of the abdomen, thought she had appendicitis; that she had known that she was going to have a baby, and that she had had an operation performed for the production of an abortion; that the abortion had been performed on her by the use of instruments on March 8th. The defendant's name was not disclosed in connection with the testimony of either doctor. Both doctors testified that the statements made to them by Dorothy as to her pregnancy, the abortion, and as to her condition subsequent to March 8th, were necessary for them to know in order to properly prescribe treat-

ment. The testimony so admitted was in connection with the testimony of the opinion which the doctors formed partly upon such statements and partly from their physical examinations.

"Where a statement to a physician, although narrative in character, relates to a matter which it is necessary or proper for him to know in order that he may accurately diagnose and properly treat the case, it may be shown." 22 C. J. Evidence, p. 269, § 270. See cases cited under note 93.

In *Gilchrist v. Mystic Workers of World,* 188 Mich. 466, 154 N. W. 575, in an action on an insurance policy, a nurse of the deceased testified as to declarations made by the deceased as to how and when the abortion was performed which caused her death. The testimony was held admissible; also the doctor's certificate of death, which stated the cause of death to be peritonitis—contributory—abortion, was held admissible.

To the same effect see *Omberg v. United States Mutual Accident Asso.* 101 Ky. 303, 309, 40 S. W. 909; *Wadlow v. Perryman's Adm'r,* 27 Mo. 279; *Pullman Palace Car Co. v. Smith,* 79 Tex. 468, 14 S. W. 993; *Missouri K. & T. Ry. Co. of Texas v. Rose,* 19 Tex. Civ. App. 470, 49 S. W. 133.

The statements of the deceased testified to by Drs. Fowler and Houghton are corroborated by the defendant's testimony. He testified fully that Dorothy was pregnant when he examined her on the evening of March 8th. He further testified as to the use of instruments upon her and that a miscarriage followed during the night of March 10th. As to the actual facts, there is no conflict in the evidence. The question of intent, which was for the jury, had to be deduced from a conceded state of facts. There was no error in the admission of the testimony of the doctors.

We can find no error in rejecting any evidence offered by the defendant. It appears that when defendant offered to show that Dorothy had taken some medicine for the purpose

of producing a miscarriage, the court sustained an objection to the admissibility of such evidence. The court then said:

"The burden is on the state here to prove that Dr. Kraut performed an illegal operation on the body of this Dorothy Holzinger for the purpose of producing a miscarriage, an abortion as it is called. Well, now, the state has got to prove that. Whether or not she had been taking medicine before she went to him, I do not think can be material."

However, it appears that upon further consideration the court did admit such evidence. We have carefully examined the instructions, the alleged improper remarks of the court and the district attorney, and can find no error in those respects. It is contended that defendant did not have a fair trial, and for that reason the court should have granted him a new trial. The record does not disclose anything to indicate that defendant did not have a fair trial. The verdict was fully sustained by the evidence.

*By the Court.*—Judgment affirmed.