STATE, Respondent, vs. JOHNSON, Appellant.

*April 3—April 28, 1936.*

446

For the appellant there was a brief by *Eberlein & Larson* of Shawano, and oral argument by *M. G. Eberlein.*

For the respondent there was a brief by the *Attorney General, J. E. Messerschmidt,* assistant attorney general, and *Wendell McHenry,* district attorney of Waupaca county, and oral argument by *Mr. McHenry.*

FRITZ, J.  The defendant, Orville Johnson, appeals from a judgment convicting him of violating sec. 340.39, Stats., in that on February 23, 1935, in Waupaca county, he did assault and feloniously rob and steal from the person of John J. Dempsey and the cash register of Theresa Selvog, lawful money, being then and there armed with a dangerous weapon, to wit, a loaded revolver, with intent, if resisted, to kill or maim the person robbed, contrary to sec. 340.39, Stats. That offense was charged in the first of six counts, the substance of which appears in the preceding statement. The court took a verdict in relation to only the first count.

In appealing from that judgment, defendant contends that there is no credible evidence to support the conviction; and that it rests upon the uncorroborated testimony of Thomas Konczal and Elroy Scheikert, alleged accomplices, whose testimony is shown by the record to be wholly without evidentiary value. In passing upon that assignment of error, the following facts, established without dispute, should be noted at the outset: Between 11 and 12 o'clock, p. m., on Saturday, February 23, 1935, Theresa Selvog, who operated a tavern located three miles east of Clintonville on Highway No. 156, and John Dempsey and another patron at the tavern were held up and robbed by Thomas Konczal and Elroy Scheikert, who, after brandishing loaded revolvers and ordering Mrs. Selvog and the patrons to hold up their arms and face the wall, searched them and the premises. While Konczal and Scheikert were committing that robbery in the

tavern, Johnson and Frank Nerod were in Scheikert's automobile which was parked on the private driveway in front of the tavern. Johnson, Scheikert, Konczal, and Nerod had left Milwaukee about 4 o'clock that afternoon in Scheikert's automobile and arrived at Clintonville about 9 o'clock, p. m. After spending some time there, they drove east on Highway No. 156 and Johnson directed Scheikert to Mrs. Selvog's tavern. Konczal went in alone for about ten minutes, and, upon his return to the automobile, the four men rode east and west on the highway several times before again stopping on the tavern driveway where the automobile remained while the robbery was committed. Scheikert, Konczal, and Nerod then entered the tavern, but Nerod became ill and was brought back to the car by Konczal, who immediately re-entered the tavern and joined Scheikert in the holdup. Upon commencing the holdup, the front window shades of the tavern were pulled down, and the lights inside the tavern and on the private driveway were switched off in the tavern. After the holdup, Konczal and Scheikert returned to the car with a slot machine, and the four men then drove to Clintonville and south three miles on Highway No. 26, and east and west on several crossroads to a side road where the slot machine was broken open and the money removed. They rode back to Highway No. 26 then and let Johnson off at another side road on which he walked about a mile west to his parents' home. His companions returned to Milwaukee that night, but he did not go back there until the next Tuesday.

In addition to the evidence which established those undisputed facts, there was sufficient credible and corroborating evidence to establish the following facts beyond any reasonable doubt, although they were disputed by Johnson, to wit: Johnson accompanied Konczal, Scheikert, and Nerod on that trip to Mrs. Selvog's tavern pursuant to prior conversations and a conspiracy between them, pursuant to which they in-

tended that night to commit a holdup and robbery with the use of revolvers at a tavern to which Johnson was to direct them. In planning that holdup, Scheikert and Konczal, in Johnson's hearing, spoke about the two revolvers which they proposed to take along, and they also discussed and handled those weapons during the drive to Clintonville. When the automobile was parked the last time in front of the tavern, Johnson said that he was known in that locality and would be recognized if he entered the tavern. Konczal offered a mask to him, but he stayed on guard at the automobile while Scheikert, Konczal, and Nerod, after taking the revolvers out of the car, entered the tavern to commit the holdup, and while Konczal, after first bringing Nerod back to the automobile and there taking one of the revolvers from him in Johnson's presence, re-entered the tavern with both revolvers and joined Scheikert in committing the holdup and robbery. While they were doing that, Johnson detached a wire to the distributor on Dempsey's parked automobile so as to render it unusable; and, upon the approach of another automobile on the highway, Johnson knocked at the tavern door and called to Scheikert to come out. After the four men finally drove away, Johnson was given $5 of the stolen money and he also took some of the nickels when they opened the slot machine. Although the other three men did not accompany him to his parents' farm, and were not with him when he returned alone to Milwaukee, he never told any official of the crime, until he was confronted, after his arrest, with written confessions made by Scheikert and Konczal after their arrest for another robbery committed a month later at Germantown.

Those facts, if found by the jury beyond a reasonable doubt, although they were disputed and denied by Johnson, were sufficient to establish his participation in the robbery with knowledge on his part of his associates' intentions, before leaving Milwaukee to commit the robbery at a tavern

to which he was to direct them, and to use revolvers in order to accomplish that purpose. Consequently, the evidence warranted finding Johnson guilty as charged in either the first, or any of the other counts of the information. Even though there were conflicts in the testimony of Konczal and Scheikert at the preliminary examination and on the trial, and also between their testimony and that of Johnson at the trial, in respect to whether Johnson had participated in discussing revolvers and a robbery before leaving Milwaukee; whether revolvers were handled or discussed while they were en route to Clintonville; whether Johnson advised committing the robbery at the Selvog tavern or directed his companions to that tavern; whether he was offered a mask while en route to the tavern or before Konczal entered the tavern the last time; whether Johnson, in trying to enter at the tavern door and calling to Scheikert to leave while the robbery was in progress, did so to prevent it or to warn him of the approach of an automobile; and in many other respects, those conflicts did not render Konczal's and Scheikert's testimony conclusively incredible. They resulted merely in issues for the jury as to the credibility of the respective witnesses and their testimony.

Johnson also assigns error in respect to rulings by the court restricting his counsel's cross-examination of Konczal in relation to the latter's former testimony on the preliminary examination. Counsel, instead of first putting the usual questions to Konczal for the purpose of laying a foundation for impeaching him by subsequently introducing contradictory or conflicting former testimony, given by him at the preliminary examination, insisted on asking the following questions: "You want to claim now you did not tell the truth at that time? Do you want to tell us that the testimony you gave down there is the same as you gave here? Did you try to tell the truth?" The court rightly, in the proper exercise

of its discretion as to the scope of cross-examination in relation to irrelevant matters, declined to admit answers to those inquiries. They were obviously argumentative in form and called for but argumentative answers as to what Konczal's former testimony was and whether he now considered it true. They did not call for relevant or material facts. The court rightly said: "His testimony given at another place is simply impeaching testimony. It can't be used for any other purpose, and you know the rule for impeaching testimony is to read him what he said at some other place that was taken under oath." However, in that connection, the court added: "It isn't necessary to ask him whether he so testified. If you want to impeach him read his testimony given at some other place into the record." That statement was erroneous. Former conflicting or inconsistent statements in testimony or otherwise, which are admissible only as matters of impeachment, cannot be introduced until after they have been read or stated to the witness to be impeached and he has been given an opportunity to recollect and state whether he made such statements. Before they can be read into the record, the witness must first be asked whether he had made a statement to that effect at some specified time and occasion, and it is only upon his denial or failure to admit making such statement that the impeaching statement can be proven. However, the purpose of that rule is to first give the witness, whom it is proposed to impeach, a fair opportunity to recollect and explain his former statement if he can. Jones, Commentaries on Evidence (2d ed.), p. 4741, § 2403; *Hinton v. Cream City R. Co.* 65 Wis. 323, 331, 27 N. W. 147; *State v. Hampton,* 79 S. C. 179, 60 S. E. 669. That opportunity was denied Konczal by the court's ruling, but the denial thereof to him did not constitute the denial of any right of Johnson's, and was not prejudicial error in so far as he was concerned. Likewise, although the established rule requires

the laying of a foundation for impeachment by first calling the attention of the witness to be impeached to the time, place, and substance, at least, of the alleged former statement or testimony as a condition precedent to the introduction thereof, the failure to first lay such a foundation may be waived by the failure of the adverse party to object in proper form to such introduction. Jones, Commentaries on Evidence (2d ed.), p. 4738, § 2403. That rule, requiring a foundation for the impeaching statement to be laid first, is likewise not for the benefit of the party who desires to prove the impeaching statement, but is solely for the protection of the adverse party who is entitled to have such former statements by a witness, who is available and can be produced to testify on the trial, excluded excepting in so far as they have been made admissible for impeachment by laying a proper foundation therefor. As far as the party who desires to prove the statements is concerned, his rightful purpose is achieved when he is permitted to introduce them. Consequently, the state, as such adverse party in the action at bar, was the only party prejudiced by the court's ruling.

Johnson also assigns as error a ruling sustaining an objection to his counsel's question to Konczal: "When did you and Elroy [Scheikert] first plan this holdup of this tavern at Germantown? How long before you held it up?" Johnson contends the answer would have been material because if Johnson participated in the robbery at the Selvog tavern, his confederates would have asked him to participate in the Germantown robbery, instead of having other confederates. As there was no connection between the crime charged herein and the robbery at Germantown, Scheikert's and Konczal's reasons for not asking Johnson to participate in the latter were not relevant. Johnson was not entitled to prove those reasons as a matter of right, and there was no abuse of discretion on the part of the court in not permitting cross-examination on that subject.

Johnson also assigns as error the court's remark: "It was the intention of *all* of them," which was made in ruling upon a motion to strike out an answer that Scheikert commenced to make in answer to the question: "When the automobile in which you were riding stopped at this tavern the last time was it your intention to go in and hold up that tavern?" The court's remark related to an important issue on the trial. Whether it was in fact "the intention of all of them"—including Johnson—to hold up the tavern was sharply in dispute, and under the evidence the jury could find either way on that crucial issue. Consequently, the court's positive statement that it was the intention of all of them constituted prejudicial error.

Error is furthermore assigned on the ground that the court did not instruct the jury that in order to convict the defendant under the first count, charging assault and robbery in violation of sec. 340.39, Stats., it was necessary for the jury to be duly convinced also that the robber was armed with a dangerous weapon "with intent, if resisted, to kill or maim the person robbed." Instead of explicitly instructing the jury as to the necessity for finding the existence of that essential element in order to convict, the court, in so far as any reference to that element is concerned, merely read the allegations in the first count in the information which, after stating the commission of the robbery, charged that it was committed while armed with "a dangerous weapon, to wit, a loaded revolver, with the intent, if resisted, to kill or maim the person robbed, contrary to the provision of sec. 340.39." And, in immediate connection with reading that count, the court merely read sec. 340.39, Stats., including the words therein, "such robber being armed with a dangerous weapon, with intent, if resisted, to kill or maim the person robbed, . . . shall be punished." But nowhere in the charge was the jury's attention called by the court to the necessity of finding, in order to convict on the first count, that the rob-

bery was committed with that intent; or that the jury had to find that each and every element of the offense as charged and defined in the statute was duly established. The prejudicial consequences of that omission to instruct the jury as to the necessity for finding the existence of that essential element were aggravated by the court's failure to mention the necessity of proving that intent, in other portions of its instructions which purported to sum up the elements essential in order to find Johnson guilty. Thus, the court's charge was incomplete and erroneous because of the omission to mention that particular element in charging that "if Orville Johnson helped plan the holdup in Milwaukee and in the ride from Milwaukee to the tavern knew of the revolvers, and as his part of the holdup stayed in the car to guard the car, watch and disable the Dempsey car, he is guilty as charged in the first count of the information;" and likewise in charging that "before you can find the defendant guilty you must be convinced beyond a reasonable doubt that Johnson planned with the others to hold up a tavern in Waupaca county; that the planning was done in Milwaukee and on the way to Clintonville, that he, Johnson, knew of the guns in the car; that when they got to the tavern he in some way identified it as the tavern to be held up; that he knew it was the purpose to hold it up when the others entered the tavern; that he stayed in the car while the holdup took place to guard the car, watch and perhaps pull the wires in the Dempsey car, and if you are not so convinced you must find the defendant not guilty." Those instructions were clearly misleading in authorizing a conviction under sec. 340.39, without requiring a finding that the robber was armed "with intent, if resisted, to kill or maim the person robbed." The mere requirement in those instructions in respect to a finding that Johnson "knew of the revolvers" or "knew of the guns in the car" was insufficient to inform the jury as to the necessity of finding that the re-

volvers were at hand "with intent, if resisted, to kill or maim the person robbed." The fact that the robber is armed with a dangerous weapon constitutes also one of the elements of the offense defined in sec. 340.39, Stats., but the definition does not stop with the statement of that element. It proceeds, by adding as an additional element, the condition that the robber is so armed "with intent, if resisted, to kill or maim the person robbed." It follows that there was prejudicial error in the charge in so far as the court, in purporting to state the elements that the jury had to find in order to convict on the first count, failed to require also a finding as to intent, if resisted, to kill or maim the person robbed. Without such a finding there could be no conviction on the first, second, and third counts, charging violations of sec. 340.39, Stats., but there might have been a conviction under the fourth, fifth, or sixth count charging violations under sec. 340.40, Stats. Under that section, a finding as to the intent to kill or maim the person robbed, if resisted, is not essential, and that difference in the conditions required in order to constitute the offense defined in each of those sections was probably one of the reasons for considering the offense defined in sec. 340.39, Stats., so much more serious that the minimum punishment prescribed therefor is three years instead of but one year as in the case of a violation of sec. 340.40, Stats.

Several other assignments of error have been given due consideration and found without merit, excepting that because of the incomplete state of the record it is impossible to determine whether prejudicial error resulted in the following respect: The appellant contends that the district attorney in his argument to the jury said: "Why don't the attorney for Orville Johnson call Blackie [meaning Frank Nerod]. We can't call him because we can't make him testify. He has constitutional rights." Although, if that statement was made,

the first sentence thereof was permissible comment (*Werner v. State,* 189 Wis. 26, 206 N. W. 898), that sentence when followed immediately by the second sentence: "We can't call him because we can't make him testify," may have caused the jury to believe that Nerod could be compelled to testify by Johnson, and that the latter, in failing to do that, was withholding proof prejudicial to him. Those insinuations would be improper because neither Johnson nor the state could have compelled Nerod to testify if he chose to assert his constitutional right to refuse. However, the alleged statement was not made of the record, because it was not noted by the court reporter. The district attorney admits that he made such a statement, but contends that his argument was completely answered by opposing counsel. The court, in ruling upon the motions after verdict, said that he did not recollect that the statement was made, but said: "If such thing did transpire it must have been stated in the presence of the jury that neither the state nor the defendant's attorney could call Nerod (Blackie) and compel him to testify; that he would have the right, if called by either, to stand on his constitutional rights." That instruction, if given, was proper.

It follows that because of the errors which were prejudicial for the reasons stated above, the appellant is entitled to a new trial.

*By the Court.*—Judgment reversed, and cause remanded with directions to grant a new trial.