Filed 4/27/16  P. v. Pulliam-Banks CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL PULLIAM-BANKS,<br><br>Defendant and Appellant. | A142425<br><br>(Contra Costa County<br>Super. Ct. No. 51217199) |

## INTRODUCTION

Defendant Michael Pulliam-Banks appeals from his conviction of involuntary manslaughter.  (Pen. Code, § 192, subd. (b).)[1]  He contends his trial counsel was ineffective for failing to object to portions of the prosecutor's closing argument, and the trial court erred in determining he was presumptively ineligible for probation.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In December 2010, defendant was 18 years old and living with his sister in Vallejo.  He was unemployed and made money selling marijuana and cutting hair.  On December 20, he told a friend he wanted to buy a quarter pound of marijuana.  The friend put him in contact with Arnold Muckleroy, who had marijuana for sale.  Defendant and Muckleroy arranged to meet that day in a residential neighborhood in Antioch to conduct the sale.

---

[1]  All further statutory references are to the Penal Code unless otherwise indicated.

1

Around 5:00 p.m., defendant and his friend, Brandon Washington, went to the meeting place in a green Ford Escort defendant had borrowed from another friend. Defendant drove and Washington was in the front passenger seat. Muckleroy received a ride to the meeting place from his friend Desirae Pestana. She had her two small children with her; they were in car seats in the backseat of her car. She pulled up directly behind the green Escort, and Muckleroy got out of her car and got in the right rear seat of the Escort. As Pestana looked back to check on her children, she heard three gunshots.[2] When she turned around, she saw the green Escort speeding off and Muckleroy lying in the gutter. Muckleroy died from a single gunshot to the head.

The district attorney charged defendant with murder (§ 187, subd. (a); count 1) and attempted robbery (§§ 211, 212.5, subd. (c), 664; count 2). The district attorney alleged a robbery special circumstance (§ 190.2, subd. (a)(17)) in connection with count 1 and a firearm enhancement (§ 12022.53, subds. (b)–(d)) for both counts.

At trial, the prosecutor's theory was defendant intended to rob Muckleroy of his marijuana. The defense argued defendant only planned to buy marijuana that day, and the shooting was an accident.

Defendant testified in his own behalf. He admitted he had a gun, a .45 caliber Glock, in his waistband when he met Muckleroy. He was "pretty nervous" as this was his "first time meeting this guy, and [he'd] been robbed before in situations like this." According to defendant, Muckleroy's manner was "[r]eal aggressive like." Muckleroy told defendant he did not have the marijuana with him and "You gotta take me to Brentwood to go get it, but I need to hold the money first." Defendant thought "this is not how a normal drug deal goes down. It feels—it feels really funny right now." He became concerned about the car behind him (Pestana's car) and thought "[Muckleroy] was trying to take advantage of me and take my money."

At that point, defendant pulled his gun from his waistband. It was common for both sellers and buyers of marijuana to have weapons, but Muckleroy did not show him a

---

[2] A bystander, however, heard only one gunshot. Defendant maintained there was only one accidental gunshot.

gun or say he had a gun. Defendant pointed his gun down and "racked the slide, chambering the bullet." His purpose was "[t]o try to scare" Muckleroy. Defendant testified "I felt like he was trying to do something with my money" and "I was worried about my—my life, you know, 'cause I didn't know . . . who he had came with initially, so all these thoughts are going through my head, so that's why." When Muckleroy saw the gun, he moved to open the car door and get out. Defendant swiveled in his seat and his gun pointed toward Washington. Washington backhanded defendant's hand holding the gun and said " 'Mike, what the fuck.' " Defendant heard a pop, and Muckleroy fell down. He fell completely out of the car. Defendant was scared and drove away.

Defendant testified the gunshot "was definitely on accident." He threw the gun over the San Francisco Bay Bridge. In May 2011, he turned himself in because he felt guilty and "couldn't keep living like that."

The jury found defendant not guilty of murder and attempted robbery, but guilty of involuntary manslaughter. The jury also found true the allegation defendant personally used a firearm in committing the offense. (§ 12022.5, subd. (a).)

### DISCUSSION

### A.   *Failure to Object to the Prosecutor's Statements*

Defendant contends the prosecutor misstated the law and misled the jury on the prosecution's burden of proof in her closing argument and rebuttal. He further claims he received ineffective assistance of counsel because his trial counsel failed to object to any of the alleged instances of prosecutorial misconduct or error.[3] We conclude trial counsel did not render ineffective assistance.

To establish ineffective assistance of counsel, "the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show

---

[3] The California Supreme Court has observed the term prosecutorial "misconduct" is somewhat inaccurate given that no bad faith is required to establish an error; a prosecutorial transgression such as a misstatement of the law is more aptly described as prosecutorial "error." (*People v. Centeno* (2014) 60 Cal.4th 659, 666–667 (*Centeno*).)

resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance." (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).)

"On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*Mai*, *supra*, 57 Cal.4th at p. 1009.)

"A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel. The appellate record, however, rarely shows that the failure to object was the result of counsel's incompetence; generally, such claims are more appropriately litigated on habeas corpus, which allows for an evidentiary hearing where the reasons for defense counsel's actions or omissions can be explored." (*People v. Lopez* (2008) 42 Cal.4th 960, 966 (*Lopez*).)

### 1. *The Prosecutor's Statements*

Defendant maintains the prosecutor misstated the reasonable doubt standard. He cites the following arguments made by the prosecutor.

At the beginning of her closing argument, the prosecutor told the jury: "As jurors, what you do is you look at the evidence and determine what's reasonable and what's unreasonable. *You disregard what isn't reasonable.* And what we have in situations when there are crimes . . . is that there's evidence. And what the evidence does is it speaks to you. It tells you what happened. And, as jurors, what you do is listen and see what it has to say." (Italics added.)

4

Later, she noted defendant had sold drugs in the area of the shooting since he was 16 years old. She argued defendant's "*argument and his theory* that I am so afraid or I'm so concerned for my safety that I'm gonna bring a loaded .45 caliber Glock, okay, that that's why I bring this 'cause I'm afraid basically that someone's gonna shoot me in the head during the course of a robbery, okay, *is unreasonable. Unreasonable*." (Italics added.)

After describing the text messages between defendant and Muckleroy about setting a meeting place for the drug sale, the prosecutor asked "And what is the reasonable interpretation of this, okay?"

The prosecutor concluded her closing argument as follows: "In looking at all of the evidence in this particular case, ladies and gentlemen, *it is looking at reasonable interpretations and discounting unreasonable*. It is not buying the defendant's theory that somehow he is going to meet someone in a vehicle at a time when he's so concerned that he has a .45 caliber Glock. [¶] And when looking at all of the evidence, all of the facts, ladies and gentlemen, the People know that, based upon this, you will render a verdict of guilty." (Italics added.)

Finally, in her rebuttal, the prosecutor told the jury to consider *all* the evidence. She also presented a hypothetical to illustrate the reasonable doubt standard, which defendant refers to as the "pet-guessing analogy":

> "Counsel talked about what the burden of proof is and how you evaluated the evidence. However, the defense argument is incorrect in terms of its interpretation as to how you look at the evidence.
>
> "The defendant said, well, you take out defense—you take out one piece of evidence and you take a look at that and determine whether or not it raises a reasonable doubt. In this case you look at all of the evidence that's presented to you. The evidence presented in its entirety. When the defendant takes the stand, the cross-examination, the cross-examination of all witnesses.
>
> "And let me give you an example about how you look at the evidence to determine whether or not the evidence proves beyond a reasonable doubt the defendant's guilt.

"Let's say, for example, you want to find out what your best friend's pet was when they were growing up, okay? And you're given a whole bunch of evidence and a whole bunch of material. Okay. What's their pet's—you know, what is the pet that they had when they were younger? And you're given a bunch of material. And one of the pieces is, well, it has fur, okay? You don't say, well anything could have fur, so I'm not convinced beyond a reasonable doubt as to what that pet was.

"You look at everything that's been presented to you, and the evidence presented to you was that it was — it had fur, it had a long tail, it had pointy ears and it says 'meow,' okay? You don't just take up one piece of evidence and look at it and say, 'Oh my gosh, this could be reasonable or unreasonable.' You look at all the information together to see how it's put together."

2.    *Analysis*

"It is permissible to argue that the jury may reject impossible or unreasonable interpretations of the evidence and to so characterize a defense theory. [Citations.] It is permissible to urge that a jury may be convinced beyond a reasonable doubt even in the face of conflicting, incomplete, or partially inaccurate accounts. [Citations.] It is certainly proper to urge that the jury consider all the evidence before it." (*Centeno*, *supra*, 60 Cal.4th at p. 672.) The California Supreme Court has specifically approved a "prosecutor's argument that the jury must ' "decide what is reasonable to believe versus unreasonable to believe" and to "accept the reasonable and reject the unreasonable." ' " (*Ibid*.)

On the other hand, it is error for a "prosecutor to suggest that a 'reasonable' account of the evidence satisfies the prosecutor's burden of proof" or " to state that 'a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence.' " (*Centeno, supra*, 60 Cal.4th at pp. 672–673, italics omitted.)

Considering the prosecutor's initial closing argument, as well as her statement in rebuttal, that the jury must consider all the evidence, we see nothing improper. Statements that the jury should "disregard" and "discount" unreasonable interpretations of the evidence, that the defense theory was an unreasonable interpretation of the evidence, and that the jury should consider all evidence before it, are well within the

6

bounds of appropriate argument.[4] The prosecutor did not suggest either the prosecution met its burden of proof simply because its theory was reasonable or the defense had a burden to prove innocence. To the contrary, the prosecutor told the jury "the People have the burden of proving beyond a reasonable doubt that the killing was not excused." Given that the prosecutor's arguments were not improper, "there was no reason for a defense objection. Therefore, the failure to object did not result in a violation of defendant's constitutional right to the effective assistance of counsel." (*Lopez*, *supra*, 42 Cal.4th at p. 968.)

Furthermore, "deciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance." (*People v. Maury* (2003) 30 Cal.4th 342, 419 (*Maury*).) Even if we were to assume portions of the prosecutor's initial closing were misleading, defendant cannot establish ineffective assistance of counsel because "defense counsel could have legitimately decided that it was tactically wise not to interrupt the prosecutor but to respond to the [prosecutor's misconduct] . . . during his own closing argument." (*People v. Welch* (1999) 20 Cal.4th 701, 764.) In fact, defense counsel did discuss the presumption of innocence and reasonable doubt at great length during his closing argument.

Next, we consider the prosecutor's pet-guessing analogy. Defendant asserts the analogy is similar to a prosecutor's presentation deemed improper in *Centeno*, *supra*, 60 Cal.4th 659. In *Centeno*, the prosecutor displayed a geographical outline of California and asked the jury to consider a hypothetical trial on what state it was. She described hypothetical testimony that contained inconsistencies, omissions, and inaccuracies, but argued the jury would have no reasonable doubt that the state was California. (*Id.* at p. 664.) Our high court found the central flaw in the prosecutor's argument was that the visual aid showing the shape of California was not supported by "evidence" from the hypothetical trial: "[T]he prosecutor began with the outline of California. She did not

---

[4] Indeed, defense counsel similarly argued "[W]hen considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

7

posit that the outline had been established by any evidence; it was simply presented as a given. The essential question, '[W]hat state is this?,' began with an important factor presumed: that the outline was, indeed, the depiction of a state. In these two respects, the hypothetical invited the jury to jump to a conclusion before the prosecutor recounted any other hypothesized 'evidence.' " (*Id*. at p. 670, fn. omitted.)

The court explained further: "The use of an iconic image like the shape of California . . . , unrelated to the facts of the case, is a flawed way to demonstrate the process of proving guilt beyond a reasonable doubt. . . . [S]uch demonstrations trivialize the deliberative process, essentially turning it into a game that encourages the jurors to guess or jump to a conclusion." (*Centeno, supra*, 60 Cal.4th at p. 669.) Defense counsel in *Centeno* failed to object to the prosecutor's presentation, and the court concluded this omission amounted to ineffective assistance of counsel. (*Id.* at pp. 675–677.)

*Centeno* is distinguishable. First, the pet-guessing analogy the prosecutor offered in this case did not suffer from the central flaw of the hypothetical trial in *Centeno* as it did not involve a visual aid and did not presume important facts not supported by hypothetical "evidence." While the analogy may have oversimplified or trivialized the jury's task, the prosecutor's argument did not invite the jury to jump to conclusions. Defense counsel reasonably could have determined that the prosecutor's argument, absent the iconic imagery, was not particularly misleading or effective and, therefore, did not require an objection. Again, the decision "whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance." (*Maury*, *supra*, 30 Cal.4th at p. 419.)

Second, in *Centeno*, the trial court instructed the jury on the presumption of innocence *before* closing arguments. As a result, without an objection from the defense, "the prosecutor's argument was the last word on the subject." (*Centeno*, *supra*, 60 Cal.4th at p. 677.) Here, the trial court instructed the jury with CALCRIM No. 220 on the presumption of innocence and the reasonable doubt standard *after* closing arguments. Defense counsel knew the jury instruction would follow closing arguments as he specifically told the jury to listen the court's instruction on the reasonable doubt

standard.[5]  In this circumstance, knowing the court's instruction would be the last word on the reasonable doubt standard, trial counsel reasonably could have declined to object to the prosecutor's argument, relying on the jury to follow the court's instruction.  (See *People v. Osband* (1996) 13 Cal.4th 622, 717 [when a prosecutor's argument conflicts with the trial court's instructions, reviewing court presumes the jury followed the instructions and disregarded the argument].)

In addition, during defense counsel's closing argument, the prosecutor objected more than once to his discussion of the reasonable doubt standard.  After one objection, the trial court responded by addressing the jury:  "You know what, ladies and gentlemen?  I will read the law to you.  You will receive the instruction with regard to what is meant by reasonable doubt or beyond a reasonable doubt, so you'll receive that."  After another objection, the trial court told the jury "counsel's statements are not evidence" and "if anything that counsel says disagrees with my instruction, then you must follow my instructions."  Trial counsel reasonably could have decided not to object during the prosecutor's rebuttal based on a determination the jury was sufficiently admonished about following the court's instructions on the reasonable doubt standard and the consideration that raising an objection risked appearing disruptive or contentious to the jury.

In sum, we can conceive a reasonable tactical purpose for not objecting to the prosecutor's pet-guessing analogy.  Consequently, defendant's claim of ineffective assistance of counsel fails.  (*People v. Weaver* (2001) 26 Cal.4th 876, 926 ["In the usual case, where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions."].)

---

[5]  He told the jury:  "[W]hen the Judge reads you the instruction on reasonable doubt, listen to it.  You'll hear the phrase:  an abiding conviction of the truth.  What is abiding?  It's something that you live with.  Something that you live with for the rest of your life."

Moreover, we discern no prejudice. "When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]' " (*Centeno*, *supra*, 60 Cal.4th at p. 667.)

In this case, the main thrust of the prosecutor's closing argument was the evidence showed defendant was planning to rob Muckleroy. She offered *no* arguments related to the lesser included offense of involuntary manslaughter. Only defense counsel referred to involuntary manslaughter during closing argument. He argued: "There's arguably two different things that happened in the car. Either a brandishing, to scare Muckleroy off, you know, flashing a gun; or an assault with a deadly weapon. . . . Either one of those, you could get to involuntary manslaughter."[6] He suggested the jury had to "decide between accident and involuntary manslaughter."

The jury rejected the prosecutor's theory of the case and accepted one of the defense theories. Thus, we cannot conclude the prosecutor's pet-guessing analogy caused defendant any harm. Had defense counsel objected to the prosecutor's pet-guessing analogy during her rebuttal and the court admonished the jury on the reasonable doubt standard, it is not reasonably probable defendant would have obtained a better outcome.

**B.** *The Probation Decision*

Defendant argues the trial court denied probation under the incorrect belief he was statutorily presumptively ineligible for probation, and the case must be remanded for resentencing.

At sentencing, the trial court stated defendant was presumptively ineligible for probation under section 1203, subdivision (e)(2), based on the jury's finding of personal

---

[6] In his opening brief, defendant describes this passage as the prosecutor's argument, but it was in fact defense counsel's argument.

firearm use. This provision specifies in relevant part: "Except in unusual cases where the interests of justice would best be served if the person is granted probation, probation shall not be granted to any of the following persons: [¶] . . . [¶] (2) Any person who *used*, or attempted to use, a deadly weapon *upon a human being* in connection with the perpetration of the crime of which he or she has been convicted." (§ 1203, subd. (e)(2), italics added.)

A conviction of involuntary manslaughter, by itself, is insufficient to establish a defendant "used" a firearm under section 1203 even if the victim died from a gunshot. (*People v. Southack* (1952) 39 Cal.2d 578, 591 [defendant convicted of manslaughter did not "use the gun" if he "merely held it without due caution"] (*Southack*).) For the involuntary manslaughter instruction, the prosecution alleged defendant committed the underlying crime of either brandishing a firearm or assault with a firearm. Brandishing a firearm (§ 417, subd. (a)), however, has been described as "not a crime of violence '*upon*' [a] person, but is committed in someone's presence." (*In re Peter F.* (2005) 132 Cal.App.4th 877, 881, italics added; *People v. Hall* (2000) 83 Cal.App.4th 1084, 1096, disapproved on another ground in *People v. Correa* (2012) 54 Cal.4th 331, 343–344.) Because his involuntary manslaughter conviction may be based on a finding that he merely brandished a weapon, defendant posits it cannot be determined that he "used . . . a deadly weapon upon a human being." (§ 1203, subd. (e)(2.) Therefore, he contends, the trial court erred in finding he was presumptively ineligible for probation under section 1203, subdivision (e)(2).

The Attorney General does not dispute the claim of error, but argues defendant's claim is forfeited because defense counsel did not raise the issue at sentencing. She further argues defense counsel's conduct did not amount to ineffective assistance of counsel because there is no prejudice.

Despite the Attorney General's implicit concession, we question defendant's claim of error. *Southack*, *supra*, 39 Cal.2d 578, is distinguishable because, in this case, the jury additionally found defendant *personally used a firearm* in the commission of involuntary manslaughter under section 12022.5, subdivision (a). (See *People v. Chambers* (1972)

7 Cal.3d 666, 674 ["the meaning of the term 'use' as employed in sections 1203 and 12022.5 is consistent"]; *People v. Cazares* (1987) 190 Cal.App.3d 833, 840–841 [rejecting argument that the "use" of a deadly weapon under section 1203, subdivision (e), is narrower than the "use" of a firearm under section 12022.5].) Further, *In re Peter F.*, *supra*, 132 Cal.App.4th 877 and *People v. Hall*, *supra*, 83 Cal.App.4th 1084, stand for the proposition that a defendant may not be punished multiple times for a single act of brandishing a weapon, but these cases say nothing about whether section 1203, subdivision (e)(2), applies when an act of brandishing results in manslaughter. We need not resolve the issue, however, because we conclude defendant has not shown prejudice.

" 'In order to determine whether error by the trial court [in making a sentencing choice] requires remanding for resentencing "the reviewing court must determine if 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of error.' " ' [Citation.]" (*People v. Gutierrez* (1991) 227 Cal.App.3d 1634, 1638.) Thus, whether we consider defendant's claim of trial court error directly or, as the Attorney General urges, view the claim as one for ineffective assistance of counsel, defendant is entitled to reversal and remand only if he can demonstrate prejudice.

At sentencing, the trial court stated "[G]iven the severity of the crime, I agree with probation that this is not a case that's suitable for probation, and I find that the statutory limitation has not been overcome, and the Court will not consider a grant of probation."[7] The court then discussed the factors it considered in determining the appropriate sentence. There were no circumstances in mitigation in the facts relating to the crime. Considering facts relating to defendant, the court noted he lost his mother and was raised by relatives who loved him. Letters submitted on his behalf showed defendant was active in sports and extracurricular activities, he "was brought up with manners, morals, respect and education," and he was described as "kind-hearted, goofy, happy-go-lucky, always

---

[7] The probation officer's report recommended against probation. "[D]efendant must be sentenced to state prison due to the nature of the offense and proven enhancement. There are consequences for anyone who commits serious crimes."

had a smile on his face." The court took into account the fact defendant had no criminal record, but also observed "So how we go from that type of loving environment to selling drugs while carrying a gun, I'm not sure how we got on that path, and it was a very unfortunate choice of paths to take when others that you were raised with didn't take that path."

The court considered aggravating facts relating to the crime and defendant.

"This crime did involve great violence. The victim was shot during a drug transaction. [¶] Secondly, you were armed with and used a firearm during this transaction. [¶] Also, you asked your friend to participate in the purchase with you. You arranged the buy through yet another friend, and you borrowed a third friend's car for what that friend believed to be a robbery, but nevertheless you borrowed that car. So you were obviously in a leadership position in this whole occurrence.

"And then, the manner in which the crime was carried out took planning. I wouldn't say it's sophisticated, but it did take planning when you're going to arrange a drug deal like that, you set it up with friends, you got the car, you texted the victim, you made sure you had your gun, you arranged the place where and when to meet.

"And factors relating to the defendant in aggravation, only one that I found that you engaged in violent conduct that indicates a serious danger to society, and anybody that sells drugs in a neighborhood, a residential neighborhood, armed with a firearm is a danger to society. There were people out on that street at the time of this transaction. There were kids in the driveways, people out watering their lawns, sitting on the porches, and you are carrying out a drug transaction for, you know, a substantial amount of marijuana in this area. So that is—that's a danger to their community, and if they knew what was going on, they would have been mortified."

The court issued it sentence as follows: "So with regard to [the involuntary manslaughter conviction] . . . the Court will impose the aggravated term of four years. [¶] The Court is using the factors that you induced others to participate in the crime with you, your co-defendant, Mr. Washington. You had a leadership role, and the crime did involve great violence resulting in the death of Mr. Muckleroy, who was unarmed. [¶] Also, with regard to the [firearm-use enhancement] . . . , the Court will impose the aggravated term of 10 years. The manner in which the crime was carried out involved

13

planning. You borrowed a car, you brought a gun, you arranged the deal through a friend, you texted the victim and arranged where and when to meet, and you arranged this all in a neighborhood where you had been selling. . . . [¶] Also, you engaged in violent conduct while carrying a loaded gun."

Thus, the trial court found the aggravating circumstances outweighed any circumstances in mitigation to such an extent that it imposed the aggravated term for both the involuntary manslaughter conviction and the firearm-use enhancement. Defendant asserts remand is necessary because there is no way to separate the presumption of ineligibility from the court's ruling denying probation. We disagree. Given the significant similarity between the factors the court considered in selecting the upper term and the factors it would have considered to decide whether to grant or deny probation, we confidently conclude the trial court would not have granted probation had it believed no statutory presumption against probation applied. (Compare Cal. Rules of Court, rule 4.414 with rules 4.421, 4.423.) In other words, there is no prejudice. (We note defendant challenges only the court's decision denying probation and does claim the trial court abused its discretion by imposing aggravated terms for involuntary manslaughter and the firearm enhancement.)

In support of his argument that remand is required in this case, defendant relies on *People v. Ruiz* (1975) 14 Cal.3d 163 (*Ruiz*) and *People v. Sherrick* (1993) 19 Cal.App.4th 657 (*Sherrick*). In *Ruiz*, the defendant was convicted of possession of heroin *for sale*, and our high court modified the judgment to reflect a conviction of possession only. (*Ruiz*, *supra*, at pp. 164–165.) The court then concluded the defendant was entitled to a new probation hearing "wherein the court may make a new judgment relative to his fitness for probation in light of the crime of which he now stands convicted." (*Id*. at p. 167.) The court reasoned, "[W]hen . . . the sentencing court bases its determination to deny probation in significant part upon an erroneous impression of the defendant's *legal* status, fundamental fairness requires that the defendant be afforded a new hearing and 'an informed, intelligent and just decision' on the basis of the facts." (*Id*. at p. 168.) In *Sherrick*, the trial court's statements during sentencing indicated the court incorrectly

14

believed the victim was under 11 years old when the victim was in fact 14 years old and, as result, applied an inapplicable statutory presumption against probation.  (*Sherrick*, *supra*, at pp. 659–660.)  The reviewing court concluded that reversal and remand for resentencing was the appropriate remedy.  The court explained: "We cannot 'save' the judgment on a harmless error analysis.  While the offenses were undoubtedly serious, the trial court's comments unquestionably demonstrate that it was laboring under a false impression of [the defendant's] *legal* status."  (*Id.* at p. 661.)

We do not read *Ruiz* and *Sherrick* as setting aside the usual harmless-error analysis and adopting a standard of per se reversal for certain sentencing errors.  Rather, in each of those cases, it could not be determined, based on the record, that the trial court's misunderstanding or error was harmless.  Here, in contrast, the record demonstrates any error was harmless.

## DISPOSITION

The judgment is affirmed.

_____
Banke, J.

We concur:


_____
Humes, P. J.


_____
Dondero, J.

A142425, *People v. Pulliam-Banks*